IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ANDERSON/GREENWOOD DIVISION

Clara Whitten,                          )
                                        )    Civil Action No. 8:08-218-HMH-BHH
                    Plaintiff,          )
                                        )    **REPORT AND RECOMMENDATION**
                                        )        **OF MAGISTRATE JUDGE**
                                        )
          vs.                           )
                                        )
Fred's Inc.,                            )
                                        )
                    Defendant.          )
_____)

        This matter is before the Court on the defendant's motion to dismiss and for summary judgment [Doc. 28], pursuant to Federal Rules of Civil Procedure 12 & 56.  In her Complaint, the plaintiff alleges that an agent of the defendant, Fred's, Inc., sexually harassed her in violation of the South Carolina Human Affairs Law, S.C. Code § 1-13-30 *et seq*.  The defendant has moved to dismiss the plaintiff's claims for lack of subject matter jurisdiction, for untimeliness, for failure to exhaust, and for a want of substantive merit.

        Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

## FACTUAL BACKGROUND

        The plaintiff worked for the defendant from April 2005 until February 2006.  (Pl. Dep. at 17.)  The plaintiff was assigned to the position of Assistant Store Manager at Defendant's Belton, South Carolina, store on February 3, 2006.  (Pl. Dep. at 52.)   She contends that in the two days she worked at the Belton Store she was verbally harassed by Matt Green, the defendant's Store Manager, and that on both days Green touched his genitals to the plaintiff's back.  (Pl. Dep. at 60, 73.)

        The plaintiff contends that she reported the incidents to Robert Eunice, the district manager for the defendant responsible for the region which included the Belton store.  (Eunice Aff. ¶ 3.)  The plaintiff alleges that Eunice told her, upon learning of Green's

conduct, that she was overreacting and to return to work that same day.  (Pl. Dep., Ex. 17 at P0058-P0059.)

Green contends that he never touched the plaintiff and Eunice denies that the plaintiff ever complained of any sexual harassment.

## APPLICABLE LAW

Federal Rule of Civil Procedure 56(c) states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law.  As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings.  Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324.  Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at

2

252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Furthermore, Rule 56(e) provides in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e). Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action that he bears the burden of adducing at a trial on the merits.

## DISCUSSION

### I.    Effect of the Plaintiff's Bankruptcy

The defendant first contends that this case should be dismissed for lack of subject-matter jurisdiction because the plaintiff was in bankruptcy at the time this case was filed. The defendant argues that such a filing deprives her of the right to prosecute the present claims, as they are properly considered assets of the bankruptcy estate and not her own. As an alternative, the defendant contends that the plaintiff should be judicially estopped from prosecuting her claims because, notwithstanding the abandonment of the litigation asset by the trustee, she had failed to fully disclose the status of her claims to the bankruptcy court.

Under federal bankruptcy law, the bankruptcy estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11

3

U.S.C. § 541(a)(1).  The Bankruptcy Code imposes upon bankruptcy debtors an express, affirmative duty to disclose all assets, including contingent and unliquidated claims. 11 U.S.C. § 521(1) ("The debtor shall-(1) file a list of creditors, and unless the court orders otherwise, a schedule of assets and liabilities, a schedule of current income and current expenditures, and a statement of the debtor's financial affairs.").  A cause of action constitutes an asset of the bankruptcy estate. *See Taylor v. Swirnow*, 80 F.R.D. 79, 82 (D. Md. 1978).  Moreover, "[i]f a cause of action is part of the estate of the bankrupt then the trustee alone has standing to bring that claim."  *National Am. Ins. Co. v. Ruppert Landscaping Co.*, 187 F.3d 439, 441 (4th Cir. 1999).  The Court, therefore, lacks jurisdiction over the plaintiff's claims unless they have been exempted from the estate or abandoned by the trustee of the estate. *See Miller v. Pacific Shore Funding*, 92 Fed. Appx. 933, 937 (4th Cir. Jan. 28, 2004); *Brockington v. Jones*, 2007 WL 4812205, at *3 (D.S.C. 2007).

It is undisputed that the plaintiff listed a potential cause of action against the defendant and its specific nature in her October 25, 2006, bankruptcy petition.  (Whitten Dep., Ex. 10.)  In that petition, the plaintiff stated:

> **Debtor possibly could file a Sexual Harassment Lawsuit against Fred's and be awarded a settlement. (Case is being evaluated for merit right now and thus has not been filed yet. Debtor's attorney is Mary McCormick.)**

(Whitten Dep., Ex.10, Sch. B) (emphasis in original).   The plaintiff later filed this lawsuit but did not amend her petition to reflect the developing nature of the asset.  The plaintiff has also submitted evidence that the asset was abandoned by the trustee: "Property Abandoned: All Scheduled Assets."  (Bankruptcy Docket Report at 12/15/2006).  As stated, the plaintiff listed the potential sexual harassment lawsuit in her Schedule B assets.  (Pl. Dep., Ex.10, Sch. B).    The defendant has not disputed the plaintiff's evidence of abandonment.  Accordingly, this Court has jurisdiction over the case, as there is no dispute that the asset was abandon. *See Miller*, 92 Fed. Appx. at 937; *Brockington*, 2007 WL 4812205, at *3.

4

The defendant, however, argues that the plaintiff should be judicially estopped from prosecuting her claims because providing mere notice of a "potential" claim stops short of satisfying the plaintiff's obligations in bankruptcy. Judicial estoppel is "an equitable doctrine that prevents a party who has successfully taken a position in one proceeding from taking the opposite position in a subsequent proceeding." *King v. Herbert J. Thomas Memorial Hosp.*, 159 F.3d 192, 196 (4th Cir. 1998). The "courts apply judicial estoppel to prevent a party from benefitting itself by maintaining mutually inconsistent positions regarding a particular situation." *King*, 159 F.3d at 196. "The purpose of the doctrine is to prevent a party from playing fast and loose with the courts, and to protect the essential integrity of the judicial process." *Lowery v. Stovall*, 92 F.3d 219, 223 (4th Cir. 1996). This doctrine, which has been accepted in both the Fourth Circuit and this District, not only serves the purpose of preventing litigants from taking contrary positions in court filings, but also "protect[s] the essential integrity of the judicial process". *Allen v. Zurich Insurance Co.*, 667 F.2d 1162, 1166 (4th Cir.1982); *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1179 (D.S.C.1975).

As the defendant notes, federal appellate courts that have considered the question have consistently held that judicial estoppel bars a bankruptcy debtor who has concealed a claim during bankruptcy proceedings from later pursuing that claim. *See, e.g., Cannon-Stokes v. Potter*, 453 F.3d 446, 448 (7th Cir. 2006) ("[A]ppellate courts that have considered this question hold that a debtor in bankruptcy who denies owning an asset, including a chose in action or other legal claim, cannot realize on that concealed asset after the bankruptcy ends."); *In re Superior Crewboats, Inc.*, 374 F.3d 330, 332-33 (5th Cir. 2004) (addressing "the question whether judicial estoppel prohibits . . . debtors from prosecuting a personal injury lawsuit that they did not timely disclose to the bankruptcy court," the appellate court reversed the district court for its failure to have applied judicial estoppel, which is "designed to prevent such guile," and rejected the "district court's rationale [that] allows these debtors to have their cake and eat it too")

The Fourth Circuit has adopted a four prong test to determine whether judicial estoppel should be applied in any particular case.  The doctrine applies where "1) the party to be estopped [is] advancing an assertion that is inconsistent with a position taken during previous litigation; 2) the position [is] one of fact instead of law; 3) the prior position [was] accepted by the court in the first proceeding; and 4) the party to be estopped [has] acted intentionally, not inadvertently." *Folio v. City of Clarksburg*, 134 F.3d 1211, 1217 (4th Cir.1998);

Citing, among other cases, *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314 (3d Cir. 2003), *Jethroe v. Omnova Solutions, Inc.*, 412 F.3d 598, 600 (5th Cir. 2005), and *Barger v. City of Cartersville*, 348 F.3d 1289, 1296 (11th Cir. 2003), the defendant contends that the plaintiff should be estopped from prosecuting her present claims because she took inconsistent positions insofar as she (1) failed to disclose in bankruptcy her claims against the defendant with sufficient specificity, including an estimated monetary value, and (2) did not fulfill her ongoing obligation to disclose the status of the legal asset after the lawsuit was actually filed.

The Court disagrees that the plaintiff has taken inconsistent positions as between her bankruptcy petition and this case.  The undersigned has considered the cases cited by the defendant and finds no reason why they should control in this case.  In *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General*, 337 F.3d 314 (3rd 2003), the Eleventh Circuit Court of Appeals specifically affirmed on the grounds that the bankruptcy court found that the plaintiff, a corporation, purposefully concealed the pending litigation in hopes of retaining any recovery for itself.  *Id*. at 320.  Further, the plaintiff expressly conceded its failure to disclose.  *Id*.  Finally, the language actually included in the corporate plaintiff's Amended Disclosure Statement was "little more than boilerplate" and did not specify any of the claims, which were actually filed against GM.  *Id*.

In *Jethroe v. Omnova Solutions, Inc.*, 412 F.3d 598, 600 (5th Cir. 2005), the plaintiff filed her EEOC charge approximately eight months *before* she filed her bankruptcy petition.  *Id*. She concealed that charge and the legalities associated with it, even though

6

she had made various appearances before the bankruptcy court. *Id*. She filed a lawsuit while her bankruptcy case remained open and did not disclose it. *Id*.

In *Barger v. City of Cartersville*, 348 F.3d 1289, 1295-96 (11th Cir. 2003), the plaintiff failed completely to disclose her employment discrimination claim to the bankruptcy court. *Id*. The only issue was whether the failure had been inadvertent. *Id*.

This present case does not involve comparable facts. The plaintiff did not fail to disclose her potential claims nor did she disclose them in boilerplate generalities. As quoted above, she identified both the nature of the clam ("sexual harassment") and the potential defendant ("Fred's). This is more detail than included in any of the cited cases.

The fact that the asset was only then a potentiality or that the plaintiff did not ascribe it any specific monetary value does not alter the Court's view of the disclosure. The Court is unaware of any Fourth Circuit decision that would dictate estoppel for either reason. Moreover, the *Krystal* decision, relied upon by the defendant, did not expressly hold that a monetary estimate must always be included in the disclosure; rather, it simply noted that the plaintiff, in that case, had failed to do so, compounding the disclosure's general want of specificity. *See Krystal*, 337 F.3d at 320.

The Court would agree that the plaintiff has an ongoing duty to disclose assets to the trustee, as a general rule. *Jethroe*, 412 F.3d at 600. This principal is specifically expressed in *Jethroe*, but in that case the plaintiff failed to disclose in any respect an EEOC charge which had been filed 8 months prior to bankruptcy. *Id*. There is nothing before the Court which would suggest that the plaintiff was attempting to conceal the asset. She, in fact, disclosed it.

The Court does not conclude that the trustee has any affirmative duty to inquire about the status of any disclosed and potential claims, but, at the same time, the trustee in this case had all relevant information upon which to make inquiry, had he or she any interest to do so. As stated, the plaintiff identified the claim, the putative defendant, and even her attorney. There is no evidence that the bankruptcy court or estate was swindled by the disclosure made. The Court cannot conclude that such disclosure is inconsistent

7

with her decision to now file this lawsuit and, therefore, the Court declines to exercise judicial estoppel.

## II.    Failure to Exhaust State Law Claim

The plaintiff has pled only one claim, pursuant to the South Carolina Human Affairs Law ("Human Affairs Law"). The Human Affairs Law sets forth certain administrative exhaustion requirements: "Any person shall complain in writing under oath or affirmation to [the South Carolina Human Affairs Commission ("SHAC")] within one hundred eighty days after the alleged discriminatory practice occurred." S.C. Code Ann. § 1-13-90(a). That administrative requirement must be satisfied prior to commencement of any judicial action. *See Settles v. Pinkerton, Inc.*, 482 F. Supp. 461, 465 (D.S.C. 1979). Dismissal of a federal lawsuit is appropriate where the plaintiff has failed to exhaust such administrative remedies. *Id*. (dismissing the plaintiff's claim where he "was required to exhaust [the] state remedy" before SHAC).

It is undisputed that the plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 15, 2006. (Def. Resp. Summ. J., Attach. 1.) The plaintiff did not separately file a charge of discrimination with the South Carolina Human Affairs Commission ("SHAC"), the comparable state agency to the EEOC. The Charge itself, however, states in boilerplate type: "I want this charge filed with both the EEOC and the State or local Agency, if any." (Pl. Dep. Ex. 6.) The defendant argues, however, that the plaintiff did not exhaust her administrative remedies by filing separately with SHAC such that her claim pursuant to the Human Affairs Law may now lie in this Court.

South Carolina is a deferral state, wherein individuals may file an administrative claim with SHAC, instead of with the Equal Employment Opportunity Commission (EEOC). *See Nelson v. Lockheed Missiles and Space Co.*, 1997 WL 727609 at *1 n.1 (4th Cir. November 24, 1997); *E.E.O.C. v. Hansa Products, Inc.*, 844 F.2d 191, 192 n.1 (4th Cir.1988) (quoting 42 U.S.C. § 2000e-5(e)) ["A deferral state is one 'which has a State or local law prohibiting the unlawful employment practice alleged and establishing or

8

authorizing a State or local authority to grant or seek relief from such practice.' "]; *Reeves v. United Parcel Services*, 2007 WL 2326891, at *3 n.6 (D.S.C. 2007); *see* S.C. Code § 1-13-90, *et. seq*.  The purpose of this deferral procedure is to give the state agency a chance to resolve the claim and thereby possibly obviate the need for the involvement of the federal agency or courts.  *Jackson v. Renfro Corp. at Clinton Distribution*, 2007 WL 2302468, at *4 (D.S.C. 2007).  This deferral relationship also permits a plaintiff to satisfy her ***federal*** exhaustion requirements with the EEOC by filing with the reciprocal state agency, in this case SHAC.

There is evidence that the EEOC and SHAC also enjoy a worksharing agreement. (Pl. Resp. Summ. J. Attach. 1.)  Moreover, it appears that this District has traditionally assumed, without requiring proof, the existence of a workshare agreement between South Carolina and the EEOC such that a filing with SHAC is sufficient for a filing with the EEOC. *See Brown v. Berkeley County School Dist.*, 339 F. Supp. 2d 715,  721 n.3 (D.S.C. 2004); *Grooms v. Mobay Chem. Corp.*, 861 F. Supp. 497, 503 & n.7 (D.S.C.1991).

Typically these workshare agreements, between the EEOC and the reciprocal state agency, are "relevant only to the issue of whether a plaintiff has satisfied the administrative exhaustion requirements of the ***federal*** anti-discrimination statutes."  *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 926 (3rd Cir. 1997). (emphasis added).  "That is because federal courts lack jurisdiction to hear a Title VII claim, unless the plaintiff has filed a charge with the EEOC." *Id*.  (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974).   A claimant cannot file a charge with the EEOC in a state, such as South Carolina, that provides an administrative remedy for employment discrimination, unless the charge has been filed first with the appropriate state agency and either (1) 60 days have elapsed; or (2) the state agency has terminated its proceedings. 42 U.S.C. § 2000e-5(c).

Under these worksharing agreements, a claim that is filed first with the EEOC can be processed by the EEOC, without being investigated as an initial matter by the state administrative agency, like SHAC.  *See Woodson*, 109 F.3d at 926. Through this worksharing agreement, therefore, a state waives "its statutory right to initially process

discrimination claims, and hence this agreement operates to 'terminate' the state administrative proceedings with respect to those complaints that are filed first with the EEOC." *Id. (citing EEOC v. Commercial Office Products Co.*, 486 U.S. 107 (1988)). In other words, the worksharing agreement allows a plaintiff to proceed in court under *Title VII* without first filing with the state agency. *Id*.

The question, however, is whether the deferral and workshare quality of the state and federal arrangement, which operates to salvage a plaintiff's rights in her *federal* claims by satisfying the *federal* exhaustion requirements, operates in reverse. In other words, does filing with the EEOC satisfy the exhaustion requirements for a Human Affairs Law claim, later brought into federal or state court.

The Third Circuit has concluded that a plaintiff cannot necessarily initiate state agency proceedings as required by the reciprocal state agency merely by filing with the EEOC. *See Woodson v. Scott Paper Co.*, 109 F.3d 913 (3rd Cir. 1997). Whether a plaintiff has initiated SHAC proceedings under the Human Affairs Law is necessarily a state law issue. *See id.* The Court, however, is unaware of any state authority, including the worksharing agreement itself, which suggests that a plaintiff has invoked SHAC procedures by simply filing with the EEOC.

Accordingly, the Court finds the whole matter a close call. The plaintiff has two problems.

First, the plaintiff has not submitted the worksharing agreement or otherwise made any attempt to create issues of fact regarding the actual arrangement between the EEOC and SHAC. Nor has the plaintiff attempted to make any serious legal argument as to why filing with the EEOC satisfies the exhaustion requirements under the Human Affairs Law.

Second, the plaintiff has not produced any evidence that the charge was, in fact, filed with SHAC. In her Complaint, she admits that she received essentially no communication from SHAC regarding her Charge (Compl. ¶¶ 7-9) and she has not submitted any documents, in conjunction with this motion, suggesting otherwise.

Notwithstanding the above concerns, the Court is uncomfortable concluding that the State of South Carolina would find the plaintiff's Human Affairs Law claim unexhausted. The plaintiff's Charge is specifically directed at both the "South Carolina Human Affairs Commission" and the EEOC, and the Charge itself expressly contemplates dual filing with both agencies. (Pl. Dep., Ex. 6.)

South Carolina jurisprudence is notably scant in its treatment of the Human Affairs Law, generally. It seems a significantly harsh result, in the absence of guidance from the courts of South Carolina, to dismiss the plaintiff's SHAC claim because she relied on the deferral and workshare arrangements between the EEOC and SHAC, which are explicitly effective to exhaust federal claims. This is especially true, when all indications on the Charge were that the plaintiff anticipated a dual filing. *See id.*

The Court, therefore, will consider the claims as exhausted.

As an additional argument, the defendant further contends that the plaintiff did not allege any Human Affairs Law claim in her EEOC Charge. While it is true that the plaintiff did not cite that statutory body specifically, she charged sexual harassment based on the identical set of facts now at issue in this case. These are not circumstances where the plaintiff charged an age discrimination claim, pursuant to the ADEA, but then sued for retaliation, under Title VII. *See, e.g., Sloop v. Memorial Mission Hosp., Inc.*, 198 F.3d 147, 149 (4th Cir. 1999) (dismissing the plaintiff's Title VII claim and finding she had "failed to exhaust her administrative remedies" where she had alleged a violation of the Age Discrimination in Employment Act, but not of Title VII, in her charge). As the defendant recognizes, the Human Affairs Law and Title VII are parallel statutes and provide the "same substantive structure." *Orr v. Clyburn*, 290 S.E.2d 804, 806 (S.C. 1982) ("Title VII cases which interpret provisions or procedures essentially identical to those of the [S.C.] Human Affairs Law are certainly persuasive if not controlling in construing the Human Affairs Law.").

11

### III.     Statute of Limitations

The defendant next contends that even if the plaintiff has exhausted her administrative remedies, the claim should be dismissed because it is barred under the applicable statute of limitations.  The Human Affairs Law provides that an action under the statute "must be brought within one year from the date of the violation alleged, or within one hundred twenty [120] days from the date the complainant's charge is dismissed, whichever occurs earlier . . . ."  S.C. Code Ann. § 1-13-90(d)(6) (emphasis added).

The EEOC issued its dismissal on September 21, 2006. (Pl. Dep., Ex. 7.)  The defendant argues that this date must necessarily be the time from which the statute of limitations began to run, based on the plaintiff's position that her EEOC charge was dually effective for purposes of exhausting her Human Affairs Law claim with SHAC.   The defendant contends that the plaintiff did not file this present lawsuit in state court until February 2, 2007 – which was 134 days after the *EEOC* issued its dismissal and therefore 14 days out of time.  (See Complaint.)  Conversely, the plaintiff contends that her suit is timely because SHAC never issued a dismissal and she filed this case within a year of the alleged violation.  *See* S.C. Code Ann. § 1-13-90(d)(6).  As stated, the defendant argues that the plaintiff is bound to consider the EEOC dismissal as a SHAC dismissal, which triggered the shorter 120 day period.

To the Court, however, the defendant has parsed the limitations point too thinly.  The statute plainly states that the 120 day period begins to run from "dismissal" of the charge by the "commission."  S.C. Code § 1-13-90(d)(6).  The Human Affairs Law expressly defines "Commission" as "the State Human Affairs Commission."  S.C. Code § 1-13-30.  Accordingly, Section 1-13-90(d)(6) cannot mean to refer to any dismissal of the EEOC.  Moreover, the plaintiff does not take inconsistent positions by claiming that her EEOC filing was effective for a SHAC filing but, at the same time, rejecting that the EEOC dismissal is synonymous with a SHAC dismissal.  The Court takes judicial notice that the two agencies perform parallel investigations and can render independent decisions.  Accordingly, the plaintiff is well within her rights to contend that the EEOC is procedurally effective to

preserve her rights in the Human Affairs Law claim while demanding that the statutorily prescribed time for bringing such claim does not begin until the SHAC, itself, has independently dismissed the charge, which admittedly has not occurred in this case.  In fact, the truly inconsistent position would be to contend that the EEOC dismissal is one in the same with a SHAC dismissal.  This is so precisely because the plaintiff's filing argument rests not on a belief that agency actions are equivalent but on the view that the EEOC would simply comply with its duties as a deferral agency and in accord with the workshare arrangement to forward the Charge to SHAC for an independent consideration.  The plaintiff has never contended that the two agencies should be viewed as effectively one.

The claim, therefore, having been filed within a year of the alleged incident is timely.

## IV.    Human Affairs Law Claim

As stated, South Carolina interprets its Human Affairs Law in accord with Title VII and, therefore, Title VII cases "are certainly persuasive if not controlling in construing the Human Affairs Law." Orr, 290 S.E.2d at 806.  Accordingly, the Court will look to that statutory body and related decisional law.

Title VII of the Civil Rights Act of 1964 states that "[i]t shall be an unlawful employment practice for any employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of ... sex." 42 U.S.C. § 2000e-2(a)(1).  The plaintiff has pled two theories of sexual harassment pursuant to Title VII: hostile work environment and *quid pro quo*.  As far as the Court can tell, the defendant has only moved for summary judgment as to the hostile work environment claim.[1]  The Court will consider that theory alone.

---

[1] The plaintiff spends a good deal of time in her response demonstrating that the *quid pro quo* theory is present in her Complaint.  It does not appear that the defendant made any rejoinder in its reply.  Without deciding, the Court would likely conclude that the theory is properly a part of the plaintiff's present lawsuit.

### A.    Hostile Work Environment

It is a violation of Title VII to maintain a sexually hostile work environment, to wit, a "workplace permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks & citation omitted).  To make out a claim against her employer for creating a hostile work environment because of sexual harassment under Title VII, a plaintiff must show "that the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." *Ziskie v. Mineta*, 547 F.3d 220, 224 (4th Cir. 2008) (quoting *Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325, 331 (4th Cir.2003) (en banc)).  In reviewing hostile environment cases, "[a]ll the circumstances are examined. . . . Evidence of a general atmosphere of hostility toward those of the plaintiff's gender is considered in the examination of all the circumstances." *Jennings v. University of North Carolina*, 482 F.3d 686, 696 (4th Cir.2007) (en banc).  The defendant argues that the plaintiff cannot create issues of fact as to either the third or fourth elements of her claim.

### 1.  Severe or Pervasive Conduct

The defendant first contends that the plaintiff cannot satisfy the third element of her hostile work environment claim because the conduct was not sufficiently severe or pervasive.  In deciding as a matter of law whether harassment was sufficiently severe or pervasive to bring it within Title VII's purview, the Court must examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Moser v. MCC Outdoor, L.L.C.,* 256 Fed. Appx. 634, 639 (4th Cir. 2007) (quoting *Harris*, 510 U.S. at 23)). This standard is designed to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and

14

occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted). "Unlike other, more direct and discrete unlawful employment practices, hostile work environments generally result only after an accumulation of discrete instances of harassment." *Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 339 (4th Cir.2006). "Harassment reaches the sufficiently severe or pervasive level when it creates 'an environment that a reasonable person would find hostile or abusive' and that the victim herself 'subjectively perceive [s] . . . to be abusive.'" *Jennings*, 482 F.3d at 696.

The Court is disturbed by the incident alleged by the plaintiff to the extent it is accurate. The plaintiff reported to work in the position of Assistant Store Manager at Defendant's Belton, South Carolina, store on February 3, 2006. (Pl. Dep. at 52.) She contends that, during an initial conversation with her new Store Manager, Matt Green, he told the plaintiff that if she went over his head, he would make her life a "living hell." (Pl. Dep., Ex. 14 at P0113.) The plaintiff further alleges that he also told her that if she wanted to get long weekends off, she should be "good to [him] and give [him] what he want[ed]." (Pl. Dep. at 86, 102.) The plaintiff has testified that, later on that same day, Green rubbed his genitals across her back. (Pl. Dep. at 60.) When the plaintiff told him not to do this again, Green allegedly just smiled at her. (Pl. Dep. at 63.)

 Green later called the plaintiff to the back stockroom, but she refused. (Pl. Dep. at 55.) She claims that he got upset with her and made her stay late to clean the store, telling her she would have to stay all night if necessary. (Pl. Dep., Ex. 15. at P0117-120.) The plaintiff contends that he repeatedly called her "stupid," even asking her, "Are you that dumb and stupid that you don't know what you're doing?" (Pl. Dep. at 70). He told her that she was in trouble, claiming that she had set the store alarm incorrectly (Pl. Dep., Ex. 15 at P0117.) The plaintiff further claims that Green told her he never wanted her in his store but that he was forced to work with her. (Pl. Dep., Ex. 15 at P0120.)

The plaintiff claims that on her second day of work at the store, Green again rubbed his genitals across her back. (Pl. Dep. at 73.)

15

Notwithstanding the inappropriateness of the unsolicited contact described and assuming that a reasonable jury, in fact, believed that it occurred, the defendant has rightly cited numerous cases that suggest that such isolated incidents of harassment, even when they include unwanted touching, are insufficient to satisfy the severe and pervasive requirement. *See Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 992-93 (8th Cir. 2003) (holding that acts, consisting of the alleged harasser's **"grabb[ing] [the plaintiff's] buttock" "with force"** and subsequently joking about the incident, did "not rise to the level of severe or pervasive conduct to . . . create an abusive working environment"); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2nd Cir. 1998) (determining that supervisor's sexual remark and **deliberate touching of the plaintiff's breasts with papers** were not severe or pervasive to give rise to actionable harassment); *Saxton v. AT&T*, 10 F.3d 526, 528, 534 (7th Cir. 1993) (finding the alleged harasser's conduct – which included **placing "his hand on [the plaintiff's] leg above the knee several times," "rub[bing] his hand along her upper thigh,"** and "kiss[ing] her for two or three seconds" – "was not so severe or pervasive as to create an objectively

hostile work environment").

The Court has examined others. *See Shaver v. Dixie Trucking Co., Inc.*, 1999 WL 321388, at *3 (4th Cir. May 21, 1999) (concluding that **supervisor placing his hand on plaintiff's knee during her job interview, rubbing plaintiff's back and shoulders and putting his arm around plaintiff several times during her employment** did not rise to the level of severe or pervasive conduct); *Shepherd v. Comptroller of Public Accounts of the State of Texas*, 168 F.3d 871 (5th Cir.1999) (affirming grant of summary judgment for defendant and finding conduct by co-worker, which included a remark that plaintiff's "elbows are the same color as [her] nipples," standing over plaintiff's desk and attempting to look down her clothing, simulating looking under plaintiff's dress and remarking "you have big thighs," **touching plaintiff's arm on several occasions, rubbing his hand from plaintiff's shoulder down to her wrist**, and on two separate occasions when plaintiff was looking for a chair after coming in late to an office meeting the co-worker patted his lap and

remarked "here's your seat," insufficient to establish a hostile work environment); *Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir.1993) (finding that a male co-worker's conduct consisting of **several incidents of unwanted touching**, **attempts to kiss**, placing "I love you" signs in work area, and asking a female employee out on dates did not create a hostile work environment.)  Most of these cases to some degree or another can be partially distinguished from the present case.  Their aggregate force, however, suggests that it is a rare circumstance where isolated incidents, even those which involve unwanted touching, qualify as severe or pervasive.

Critically, though, where the conduct is sufficiently severe, it may alter the plaintiff's conditions of employment without repetition: " [E]ven a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir.1995) *abrogated on other grounds*.  But, many of the cases in which single incidents of harassment were found to have created a hostile work environment have typically involved objectively severe instances of harassment, such as isolated sexual assault or rape.  *See Watkins v. Professional Sec. Bureau, Ltd.,* 1999 WL 1032614*, at \*3 (4th Cir. November 15, 1999) (involving an alleged rape); *Tomka*, 66 F.3d at 1305 (involving an alleged rape); *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986) (allegations of isolated harassment, including a claim of rape, are sufficient to state a claim for hostile environment harassment).  Moreover, the United States Supreme Court has emphasized that "[a] recurring point in [our] opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. Boca Raton*, 524 U.S. 775, 788, (1998).

Other courts, however, have found severe and pervasive conduct in a single incident not involving an egregious sexual assault.  *See, e.g., Moring v. Ark. Dep't of Corr.*, 243 F.3d 452, 454-57 (8th Cir. 2001) (jury question where during a business trip, a

supervisor would not leave Moring's hotel room for several hours, insisted she "owed" him for her job, attempted to kiss her, and touched her thigh).

The Court finds that this situation falls somewhere in a grey area. There can be no doubt that if the allegation is true, then the conduct is likely significant enough to begin to alter the conditions of employment. The Court is persuaded, in part, by the plaintiff's framing of the facts in light of the prevailing law. The conduct alleged is certainly severe and goes beyond an occasional use of abusive or profane language, gender-related stories, or occasional joking and teasing. In terms of the pervasiveness of the conduct, it can be argued, when looking narrowly at the circumstances of her time with Green, that it occurred 100% of the days that the plaintiff was employed at the Belton location. Although an employee might be expected to put up with an occasional crude joke, remark, or even sexual advance, no employee – who has been subjected the Store Manager having touched his genitals to her back twice, in two days – should be expected to return to work under the same conditions for a third day. Based on the evidence at her disposal, there was no reason for her to doubt that the exact same conduct would persist day after day. While not rape, the actions, if true, would almost certainly constitute criminal battery, if not some more specific crime of sexual misconduct or lewdness. The alleged conduct was frequent, relative to the time involved; relatively severe; both physically threatening and humiliating; and would reasonably be expected to interfere with the plaintiff's work performance. *See Moser,* 256 Fed. Appx. at 639.

Most of the other remarks and conduct, recited by the plaintiff, would not, on their own, constitute harassment based on the plaintiff's sex. Some can certainly be interpreted in that manner in light of other surrounding circumstances, however. A reasonable jury could certainly conclude, as apparently the plaintiff did, that comments like I will make your life a "living hell" and you must "be good to me" are, in fact, related to Green's alleged physical conduct.

The Court finds that a reasonable jury should be permitted to view the conduct alleged as certainly severe and, potentially, as pervasive, if believed.

18

## 2. Liability

The defendant next argues that it cannot actually be held liable for the conduct of Green, as alleged, and, therefore, the plaintiff has created no issues of fact as to the fourth element of her claim. The defendant attempts to deflect liability in two ways. First, by arguing that Green was merely a co-worker and not a supervisor, the defendant contends that his conduct and knowledge cannot be imputed to it in the absence of evidence that the defendant "knew or should have known about the harassment and failed to take effective action to stop it." *Howard v. Winter*, 446 F.3d 559, 565 (4th Cir. 2006). Second, the plaintiff relies on the defense as articulated in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). Under *Faragher*, an employer may avoid liability for a supervisor's sexual harassment of an employee if (1) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; (2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise; and (3) no tangible employment action was taken against the employee. *Faragher*, 524 U.S. at 807.

Both of these arguments rise and fall, at least in part, based on the defendant's contention that the plaintiff had quit prior to actually informing the defendant of Green's conduct, if at all. At best, there exist genuine issues of fact as to when the plaintiff quit. But, to the Court the defendant's position is dubious.

The defendant would emphasize that after working on Saturday, February 4, 2006, the plaintiff never returned to work. The defendant contends that this is evidence that she quit *prior* to the defendant acquiring knowledge of the harassment. [Pl. Dep. at 94.] As quoted by the defendant, the plaintiff's written notes present her version of what occurred on Sunday, February 5th:

> I called Paula [Cox – store manager at the Greenville Fred's store] on her cell phone & home phone. I started at 8:30 a.m. I called every 30 minutes. I also was trying to call Kelly Jackson who is the Operations [Manager] for Belton. Paula finally called me at 11:30 A.M. I asked her (Paula) for Matt Green phone number. Paula said why. I said I was going to quit. Paula said why. I told her. Paula said she did not have Matt phone

number. **I finally got Robert D.M. [Robert Eunice, the district manager]. I told Robert everything. I told him (Robert) about Matt touching me twice. About Matt taking furniture out with out paying for it. Robert told me I was over reacting. Robert told me to go on in and work.** We would talk to Matt Monday. I said no. I told Robert I needed Matt phone number. Robert said he did not have it. Robert has the Managers & Ass Mgr phone numbers. I finally got Kelly. Kelly said she was sick. She would not be back till Wednesday. Matt did not tell me. She (Kelly) gave me Matt phone number. I told her I was going to quit. Kelly said why? I told her all of it. Kelly said do not let Matt run you (me) off. I told Kelly I was leaving. Kelly gave me Matt phone number. I tried to call Matt. No answer. This was around 12 p.m. . . . . [sic passim].

(Pl. Dep., Ex. 17 at P0058-P0059 (emphasis added).)   The defendant would take this statement to reveal that on February 5th, before she had complained to anyone, including the district manager, about any alleged sexual harassment, the plaintiff had already privately decided to quit.  *Id.*  ("I asked her (Paula) for Matt Green phone number. Paula said why. I said I was going to quit.")  While the plaintiff admits that quitting was apparently her subjective intent, the Court thinks that a focus on those remarks misapprehends the most salient points – notably, that the plaintiff had not, in fact, quit because until such time as she declared that intent to the defendant or failed to show for work on Sunday, she was free to change her privately held decision.   Second, and most striking, the plaintiff's testimony is that she told the defendant's district manager, Robert Eunice, that Green had touched his genitals to her back and, yet, Eunice told her that she was "overreacting" and instructed her to report to work.  *Id.*  It is undisputed that Eunice is the individual that makes recommendations regarding hiring, firing, promotion, and reassignment of store and assistant managers.  (Eunice Aff. ¶ 3.)  If the plaintiff is believed, a reasonable jury could not only conclude that the defendant knew of the alleged conduct prior to the actual moment she quit but that it reacted with complete disregard to that knowledge.

These facts undercut both liability defenses of the defendant.  Eunice's alleged knowledge, which came, at the latest, in time to dissuade the plaintiff from her private decision to quit through reasonable action, (1) constitutes evidence that the defendant "knew or should of known" of the harassment, even if Green is considered a co-worker of

the plaintiff; and (2) destroys the defendant's *Faragher* defense because, if believed, it cannot be said that the defendant exercised reasonable care in responding to knowledge of the harassment.  The plaintiff's position is that she complained to the district manager and that he either unreasonably disbelieved her, in the absence of investigation, or had no concern for the allegation.  The evidence, therefore, if believed, also undermines the defendant's contention that the plaintiff failed to avail herself of opportunities to complain.

Accordingly, genuine issues of fact remain as to whether Green's conduct can be imputed to the defendant.

The Court, therefore, finds that the plaintiff's Human Affairs Law claim should survive summary judgment.

## CONCLUSION

Wherefore, based upon the foregoing, it is RECOMMENDED that the defendant's motion to dismiss and for summary judgment [Doc. 28] should be DENIED.

IT IS SO RECOMMENDED.

s/Bruce H. Hendricks
United States Magistrate Judge

January 13, 2009
Greenville, South Carolina

21