IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

| | | |
|---|---|---|
| Clara Whitten, | ) | |
| | ) | C.A. No. 8:08-0218-HMH-BHH |
| Plaintiff, | ) | |
| | ) | **OPINION & ORDER** |
| vs. | ) | |
| | ) | |
| Fred's, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court with the Report and Recommendation of United States Magistrate Judge Bruce Howe Hendricks, made in accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02 of the District of South Carolina.[1] In the complaint, Clara Whitten ("Whitten") alleges a violation of the South Carolina Human Affairs Law ("SCHAL"), S.C. Code Ann. § 1-13-30, et seq. Fred's, Inc. ("Fred's") filed a motion for summary judgment. In the Report and Recommendation, Magistrate Judge Hendricks recommends denying the motion for summary judgment. Fred's filed objections to the Report and Recommendation. After review, the court grants the motion for summary judgment.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Whitten was employed by Fred's from April 2005 until February 2006. On February 3, 2006, Whitten was transferred from the Greenville, South Carolina Fred's store to the Belton,

---

[1] The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the United States District Court. See Mathews v. Weber, 423 U.S. 261, 270 (1976). The court is charged with making a de novo determination of those portions of the Report and Recommendation to which specific objection is made. The court may accept, reject, or modify, in whole or in part, the recommendation made by the magistrate judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1).

1

South Carolina Fred's store. At the time when the relevant events occurred, Whitten was the assistant store manager at the Belton store. Whitten's first day of work at the Belton store was February 3, 2006. Whitten alleges that the Belton store manager, Matt Green ("Green"), sexually harassed her on February 3-4, 2006. According to Whitten, Green threatened to make her life a "living hell" if she went over his head and that if she wanted a favorable work schedule that she needed to be "good to [him] and give [him] what he wanted." (Def.'s Mem. Supp. Summ. J. Ex. B (Whitten Dep. Ex. 14 at P113).) In addition, Whitten alleges that Green rubbed his genitals across her back once each day. (Id. Ex. A (Whitten Dep. at 60, 73).) After each incident, Whitten submits that she told Green to quit the behavior and he just smiled. (Id. Ex. A (Whitten Dep. at 63, 78-79).) In addition, Green allegedly referred to Whitten as "stupid" and "dumb." (Id. Ex. A (Whitten Dep. at 70).) Whitten also alleges that Green scheduled her to work Super Bowl Sunday and forced her to stay late to clean. (Id. Ex. B (Whitten Dep. at Ex. 15 P0117-120).)

According to Whitten, on Sunday, February 5, 2006, she spoke with Paula Cox ("Cox"), the Greenville store manager, and Kelly Jackson, the Belton store operations manager about Green's conduct. (Def.'s Mem. Supp. Summ. J. Ex. B (Whitten Dep. Ex. 17 at P0058-60).) In addition, she notified the district manager, Robert Eunice ("Eunice"), of the sexual harassment and allegedly, Eunice informed her that she was overreacting and should return to work. (Id. Ex. B (Whitten Dep. Ex. 17 at P0058-60).) Green denies touching Whitten and Eunice denies that Whitten reported the sexual harassment to him prior to her ceasing employment with Fred's. (Id. Ex. E (Green Dep. at 62) & Ex. D. Eunice Aff. ¶ 4).)

2

Fred's has an employee handbook with an anti-harassment policy. The anti-harassment policy provided a reporting mechanism:

> [A]ny employee who has a complaint of harassment by anyone should report the problem to his or her Store Manager unless the Store Manager is personally involved in the objectionable conduct. In addition, you should also contact the Vice President of Personnel . . . .

(Id. Ex. B (Whitten Dep. Ex. 13, Employee Handbook).) Whitten knew that Fred's investigated harassment allegations pursuant to its anti-harassment policy. (Id. Ex. A (Whitten Dep. at 107).) Subsequently, Fred's investigated Whitten's sexual harassment claim and found that the charges were unsubstantiated. (Def.'s Mem. Supp. Summ. J. Ex. F (Lance Ford Decl. ¶ 7).)

On March 15, 2008, Whitten filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC"). Whitten did not separately file a charge with the South Carolina Human Affairs Commission ("SCHAC"), but indicated on the form as follows, "I want this charge filed with both the EEOC and the State or local Agency, if any." (Id. Ex. B (Whitten Dep. Ex. 6).) The EEOC dismissed Whitten's charge on September 21, 2006.

Whitten filed the instant lawsuit in state court on February 2, 2007, and Fred's removed the case to federal court on January 23, 2008.[2] Fred's filed a motion to dismiss and a motion for summary judgment on August 29, 2008. Fred's alleges that Whitten's claim should be dismissed because at the time this action was filed, Whitten had a pending bankruptcy proceeding. Further, Fred's alleges that it is entitled to summary judgment arguing that judicial estoppel bars Whitten's claim because she failed to disclose the claim to the bankruptcy court,

---

[2] Fred's learned that the case was removable based on Whitten's January 9, 2008 deposition testimony that the amount in controversy exceeded $75,000.

3

Whitten failed to exhaust her administrative remedies, Whitten's claim is barred by the statute of limitations, and finally, Whitten's claim fails on the merits.

## II. THE REPORT AND RECOMMENDATION

Magistrate Judge Hendricks recommends denying Fred's' motion to dismiss and for summary judgment for the following reasons:  (1) judicial estoppel does not bar this action because Whitten informed the bankruptcy court of the possible sexual harassment claim; (2) Whitten exhausted her state law claim when she filed her charge with the EEOC; (3) Whitten's claim is not barred by the statute of limitations because she filed it within one year of the alleged incident; and (4) "a reasonable jury" could find that Green's conduct was severe and pervasive and genuine issues of material fact exist "as to whether Green's conduct can be imputed to" Fred's.  (Report and Recommendation, generally.)

## III. OBJECTIONS

Fred's objects to the magistrate judge's Report and Recommendation on the following grounds: (1) judicial estoppel bars Whitten's claims because she is maintaining an inconsistent position from her position in the bankruptcy action; (2) Whitten has not exhausted her administrative remedies because she never filed a charge with SCHAC; (3) Whitten's claim is time barred because she filed her claim 134 days after the dismissal of her EEOC charge; (4) Whitten's claim fails on the merits because "Fred's did not have knowledge or information of any alleged harassment until after Plaintiff quit her employment;" and (5) the magistrate judge failed to address Fred's' motion for summary judgment on Whitten's constructive discharge claim.  (Objections 1-2.)

4

## IV. Discussion of the Law

### A. Summary Judgment Standard

Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248.

Moreover, "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must–by affidavits or as otherwise provided in this rule–set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). With respect to this burden, "it is the responsibility of the plaintiff, not the court, to identify with particularity the evidentiary facts existing in the record which can oppose the defendant's summary judgment motion." Malina v. Baltimore Gas & Elec. Co., 18 F. Supp. 2d 596, 604 (D. Md. 1998).

## B. SCHAL Claim

South Carolina courts interpret the SCHAL in accord with Title VII and, therefore, Title VII cases "are certainly persuasive if not controlling in construing" SCHAL. Orr v. Clyburn, 290 S.E.2d 804, 806 (S.C. 1982). Therefore, the court considers Whitten's SCHAL claim utilizing Title VII statutory law and case law. Whitten alleges a SCHAL claim based on hostile work environment, quid pro quo sexual harassment, and constructive discharge.

### 1. Hostile Work Environment

Title VII makes it unlawful for "an employer . . . [to] discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Whitten claims that she was subjected to a hostile work environment. "A sexual harassment claim due to a hostile or abusive work environment requires proof of: (1) unwelcome conduct; (2) that is based on the plaintiff's sex; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." Conner v. Schrader-Bridgeport Int'l, Inc., 227 F.3d 179, 192 (4th Cir. 2000).

### a. Supervisor or Coworker

Whitten alleges that Green, the Belton store manager, sexually harassed her on February 3-4, 2006. In evaluating Whitten's hostile work environment claim, the court must first consider whether Green was a supervisor or coworker of Whitten.

> The question of whether [Green] was [Whitten's] supervisor or her coworker is of great significance because in a case of harassment by a supervisor with immediate (or successively higher) authority over the employee, an employer is vicariously liable for the harassment, subject to limited affirmative defenses . . . . In a case where an employee is sexually harassed by a coworker, on the other hand, the

employer may be liable only if it knew or should have known about the harassment and failed to take effective action to stop it.

Howard v. Winter, 446 F.3d 559, 565 (4th Cir. 2006) (internal quotation marks and citations omitted).

"[T]he fundamental question . . . is whether [Green's] conduct was aided by the agency relation."  Id. (internal quotation marks omitted).  "The most powerful indication of supervisory status is the ability to take tangible employment actions against the victim, such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Id. at 566 (internal quotation marks omitted).

> Any harassing conduct that culminates in a tangible employment action against the victim is necessarily conduct aided by the agency relation, since it can only be taken by supervisory employees empowered by their employers to take such action.  But harassment by a fellow-employee having no authority of any kind over the victim never can be found aided by the agency relation; as to such employees, the agency relation provides no aid for their conduct but workplace proximity, and that does not suffice the purpose.  Between these extremes, there remains otherwise actionable harassment that, though it does not culminate in tangible employment action, is nonetheless aided by the agency relation.

Id. at 565-66.

Eunice, Fred's' District Manager, had the authority to hire, fire, promote, and reassign assistant store managers and store managers.  (Def.'s Mem. Supp. Summ. J. Ex. D (Eunice Aff. ¶ 3).)  Green, as store manager, did not have the authority to hire, fire, promote, or reassign Whitten.  (Id. Ex. D (Eunice Aff. ¶ 3).)

Whitten argues that Green was her supervisor.  In support of her position, Whitten alleges that Green stated that he would not allow her to be off work for long weekends unless

she was "good to him," that he scheduled her to work on Super Bowl Sunday, and that he directed her to work late cleaning. (Def.'s Mem. Supp. Summ. J. Ex. B (Whitten Dep. Ex. 14 P113, P117-20).) Further, Green called Whitten when she did not arrive for work on February 5, 2006, and then traveled to her house, at Eunice's direction, to inquire as to why she had not reported for work. (Pl.'s Mem. Opp'n Summ. J. Ex. B (Green Dep. at 22).)

The court finds that Green "did not possess any power to take tangible employment actions or make economic decisions affecting her" and "[t]he record is devoid of any evidence suggesting that [Green] could fire [Whitten], promote or demote her, reassign her, or take any other direct action against her." Howard, 446 F.3d at 566; Reinhold v. Commonwealth of Va., 151 F.3d 172, 175 (4th Cir. 1998) (finding that victim had not suffered a tangible employment action because although she alleged that "she was assigned extra work and suffered other harm as a result of her rejection of [the alleged harasser's] sexual advances, she [did] not allege that she experienced a change in her employment status akin to a demotion or a reassignment entailing significantly different job responsibilities."). Further, Whitten's assertion that Green could affect her work schedule and assign tasks is insufficient to establish Green as a supervisor and is analogous to the "minimal" authority that the alleged harassor possessed in Howard, which the Fourth Circuit found insufficient to establish supervisory status. Id. at 566; Mikels v. City of Durham, 183 F.3d 323, 331- 32 (4th Cir. 1999) (finding fact that the alleged harassor was the victim's superior in rank, was not enough to show that he was her supervisor for purposes of Title VII because he did not have the power to take tangible employment actions against the victim and his authority consisted only of "the occasional authority to direct her operational conduct while on duty"); Hall v. Bodine Elec. Co., 276 F.3d 345, 355 (7th Cir.

2002) (holding that the alleged harassor's minimal discretion over the alleged harassment victim's work operations was "not sufficient to impute Title VII vicarious liability to an employer"); Rhodes v. Illinois Dep't of Transp., 359 F.3d 498, 506 (7th Cir. 2004) (holding that evidence that alleged harassor "managed [plaintiff's] work assignments, investigated complaints and disputes, and made recommendations concerning sanctions for rule violations" was insufficient to show supervisory status). In addition, Green traveled to Whitten's house on February 6, 2006, at the direction of Eunice, Green's supervisor. (Pl.'s Mem. Opp'n Summ. J. 3.) Therefore, this fact belies Whitten's argument that Green was a supervisor of Whitten. Based on the foregoing, taking the facts in the light most favorable to Whitten, the court finds that Green was Whitten's coworker.

### b. Fred's' Liability for Green's Alleged Conduct

The magistrate judge found issues of fact remained as to whether Green's conduct was imputable to Fred's because Whitten informed her supervisor, Eunice, on Sunday, February 5, 2006, of Green's alleged conduct. Fred's objects alleging that Fred's did not know of any alleged harassment prior to Whitten's decision to quit.

Even assuming Whitten could establish the first three elements of a claim for hostile work environment, viewing the facts in a light most favorable to Whitten, the court finds there is no basis for imputing liability on Fred's. For harassment by a coworker, "employers are liable only for their own negligence in failing, after actual or constructive knowledge, to take prompt and adequate action to stop [the harassment]." Mikels, 183 F.3d at 332. "In a case where an employee is . . . harassed by a coworker, the employer may be liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop

it." Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 333-34 (4th Cir. 2003). "The law against sexual harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 268 (4th Cir. 2001) (internal quotation marks omitted). "[A]n employee may not impute liability on an employer under a theory that the employer must exercise an all-seeing omnipresence over the workplace." Howard, 446 F.3d at 567 (4th Cir. 2006). The Fourth Circuit recently noted that

> We recognize that an employee claiming harassment by a coworker bears significant responsibility in notifying the employer. We further recognize that the unpleasant nature of reporting harassing conduct does not alleviate the employee's duty . . . to alert the employer to the allegedly hostile environment, because such a rule would completely undermine Title VII's basic policy of encouraging forethought by employers and saving action by objecting employees.

Id. at 570-71 (internal quotation marks and citations omitted).

Whitten admits that she did not report any alleged harassment during February 3-4, 2006, the two days that she worked at the Belton store. (Def.'s Reply Ex. A (Whitten Dep. at 94-96).) Whitten was scheduled to work on February 5, 2006. However, Whitten did not report to work when her shift was scheduled to begin at 11:00 a.m. (Objections 22 & Ex. A (Whitten Dep. at 91).) Instead, according to Whitten, she began trying to contact Paula Cox ("Cox"), the Greenville store manager, around 8:30 a.m. and she finally spoke to Cox around 11:30 a.m. (Def.'s Mem. Supp. Summ. J. Ex. B (Whitten Dep.Ex. 17 at P0058-60).) Whitten informed Cox of Green's alleged conduct, that she was going to quit, and that someone needed to pick up her keys. (Id. Ex. B (Whitten Dep. Ex. 17 at P0058-60).) In fact, Whitten gave the keys to Green and told him that she quit when he arrived at her house to inquire as to whether

10

she was planning to work that day as scheduled. (Id. Ex. B (Whitten Dep. Ex. 17 at P0058-60).); (Pl.'s Mem. Opp'n Summ. J. Ex. B (Green Dep. at 22).)

At some point after speaking with Cox, Whitten spoke with Eunice and allegedly informed him about Green's conduct. (Def.'s Mem. Supp. Summ. J. Ex. B (Whitten Dep. Ex. 17 at P0058-60).) Eunice allegedly told Whitten that she was overreacting, she should report to work, and they would talk to Green on Monday. (Id. Ex. B (Whitten Dep. Ex. 17 at P0058-60).) Whitten told Eunice that she was not reporting to work. (Id. Ex. B (Whitten Dep. Ex. 17 at P0058-60).)

Whitten never returned to work. Whitten reported the harassment after she had decided to resign and she never provided Fred's any opportunity to investigate the allegations or remedy any alleged sexual harassment. Therefore, Fred's never knew that any alleged sexual harassment was occurring prior to Whitten's decision to quit.

Moreover, upon notification of the alleged conduct, Fred's took immediate action to investigate the charges pursuant to its anti-harassment policy. Whitten submitted a complaint on February 8, 2006, alleging that Green had touched her inappropriately and that Green's father had taken merchandise without paying for it. (Id. Ex. F (Lance Ford Aff. ¶ 4).) Lance Ford ("Ford"), Regional Loss Prevention Manager for Fred's, immediately undertook an investigation. (Id. Ex. F (Ford Aff. ¶ 4).) Ford interviewed Whitten on February 9, 2006, and six female employees of the Belton store. (Id. Ex. F (Ford Aff. ¶ 5).) Further, Cox was questioned. (Def.'s Mem. Supp. Summ. J. Ex. F (Ford Aff. ¶ 5).) None of the employees reported any inappropriate conduct by Green. (Id. Ex. F (Ford Aff. ¶ 5).) Further, Green was interviewed, denied the allegations, and produced a receipt for the merchandise purchased by

Green's father. (Id. Ex. F (Ford Aff. ¶ 6).) Ford concluded that the allegations were not substantiated, but along with the Regional Vice President, reviewed Fred's' standards of professional conduct with Green. (Id. Ex. F (Ford Aff. ¶ 7).) Based on the foregoing, Fred's took prompt and effective action to investigate and stop any harassment. The court finds that while there is evidence, when viewed in the light most favorable to Whitten, that Green created an allegedly hostile work environment, there is no evidence upon which a reasonable jury could determine that Fred's knew or should have known about the harassment *and* failed to take effective action to stop it.

### 2. Quid Pro Quo Harassment

In the Report and Recommendation, the magistrate judge noted that Fred's failed to address Whitten's quid pro quo sexual harassment claim in its motion for summary judgment. Fred's argues that the only possible quid pro quo claim is Whitten's constructive discharge claim, which was addressed in its motion. After review of Whitten's response to Fred's' motion for summary judgment, the court finds that Whitten alleges that Green scheduling Whitten to work Super Bowl Sunday and assigning burdensome cleaning duties were tangible employment actions. Therefore, the court will address the claim independently of the constructive discharge claim. To establish quid pro quo liability, a plaintiff must prove "that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753 (1998). First, as set forth above, Green was not Whitten's supervisor. Further, scheduling changes and assignment of cleaning duties are not tangible employment actions. Reinhold, 151 F.3d at 175 ("While [victim] alleges that she was assigned extra work and suffered other harm as a result of her

rejection of [the alleged harassor's] sexual advances, she does not allege that she experienced a change in her employment status akin to a demotion or a reassignment entailing significantly different job responsibilities."). Moreover, as more fully discussed below, Whitten was not constructively discharged from her employment. Therefore, Fred's is entitled to summary judgment on Whitten's quid pro quo claim.

### 3. Constructive Discharge

In addition, Whitten alleges that she was constructively discharged from her employment as a result of Green's conduct. In a "hostile-environment constructive discharge claim . . . [a] plaintiff . . . must show working conditions so intolerable that a reasonable person would have felt compelled to resign." Pennsylvania State Police v. Suders, 542 U.S. 129, 146-47 (2004). Whitten must demonstrate: "(1) that the employer's actions were deliberate, and (2) that working conditions were intolerable." Heiko v. Colombo Savings Bank, F.S.B., 434 F.3d 249, 262 (4th Cir. 2006). "An employer's actions are deliberate only if they were intended by the employer as an effort to force the plaintiff to quit." Id. (internal quotation marks omitted). "Whether an employment environment is intolerable is determined from the objective perspective of a reasonable person." Id. (internal quotation marks omitted). "However, mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." Id. (internal quotation marks omitted).

Whitten resigned without giving Fred's a sufficient opportunity to remedy the alleged harassment. Whitten informed Eunice of Green's alleged conduct after she had failed to report to work for her shift and had decided to quit. (Def.'s Mem. Supp. Summ. J. Ex. B (Whitten

13

Dep. Ex. 17 at P0058-60).) An employer's "intent may be inferred from a failure to act in the face of known intolerable conditions." Amirkori v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1133 (4th Cir. 1995). In the case at bar, Fred's did not know of any intolerable working conditions for Whitten. Therefore, Fred's' actions were not deliberate. Further, Whitten's working conditions were not so intolerable that she reasonably thought that resignation was the only option. At a minimum, instead of quitting, Whitten could have requested a transfer to another store. Whitten knew that transfer was an option having just been transferred from the Greenville store.

"Part of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast." Smith v. Goodyear, 895 F.2d 467, 473 (8th Cir. 1990). "An employee who quits without giving her employer a reasonable chance to work out a problem is not constructively discharged." West v. Marion Merell Dow, Inc., 54 F.3d 493, 498 (8th Cir. 1995). Therefore, the court finds that after considering the facts in the light most favorable to Whitten, a reasonable person in her position would not have felt compelled to resign without giving Fred's an opportunity to remedy any alleged harassment. After review and for the reasons set forth above, the court declines to adopt the Report and Recommendation of the magistrate judge.[3]

---

[3] Having found that Whitten's SCHAL claim fails on the merits, the court declines to address Fred's' additional grounds for summary judgment.

It is therefore

**ORDERED** that Fred's' motion for summary judgment, docket number 28, is granted.

**IT IS SO ORDERED.**

s/Henry M. Herlong, Jr.
United States District Judge

Greenville, South Carolina
February 11, 2009